COMMONWEALTH *vs.* VIENGSAYMAY CHALEUMPHONG
(and three companion cases[1]).

Middlesex. February 9, 2001. - April 30, 2001.

Present: GREANEY, IRELAND, SPINA, & CORDY, JJ.

*Jury and Jurors. Practice, Criminal,* Jury and jurors, Challenge to jurors, Agreement between prosecutor and witness, Argument by prosecutor, Instructions to jury, Capital case. *Witness,* Police officer, Credibility, Corroboration. *Evidence,* Credibility of witness, Consciousness of guilt, Joint enterprise. *Intoxication. Malice. Homicide. Joint Enterprise.*

No substantial likelihood of a miscarriage of justice was created at a murder trial by the judge's announcing during the third day of empanelment that he might seat fewer than sixteen jurors, and then actually empanelling sixteen. [73-74]

At a murder trial, the record of examination and cross-examination of a police witness did not demonstrate any vouching by the witness for other cooperating Commonwealth witnesses who testified under the terms of plea agreements. [74-76]

At a murder trial, testimony of an assistant district attorney who had been assigned to the investigation did not constitute vouching for cooperating witnesses who testified under plea agreements [76-77]; and there was no merit to a defendant's claim that the judge should have given a limiting instruction after the testimony to the effect that the Commonwealth has no way of determining whether such a witness is testifying truthfully [77].

At a murder trial, the prosecutor's comment in closing argument about the cooperating Commonwealth witnesses was fair comment on defense counsel's argument. [77-78]

Evidence at a murder trial was not sufficient to warrant the giving of an instruction on voluntary intoxication. [78]

At a murder trial, no substantial likelihood of a miscarriage of justice was created by the judge's correct instructions on consciousness of guilt and malice aforethought. [78-79]

At a murder trial, the judge's instructions on joint venture did not relieve the Commonwealth of its burden of proving the element of extreme atrocity or cruelty, where the Commonwealth had no burden to prove the defendant's knowledge that the coventurer knew that his acts were extremely atrocious and cruel. [79-80]

INDICTMENTS found and returned in the Superior Court Department on December 24, 1997.

---

[1] Two against Donnie Bouphavongsa and one against Viengsaymay Chaleumphong.

The cases were tried before *James F. McHugh, III*, J.

*Dana Alan Curhan* for Donnie Bouphavongsa.

*Robert L. Sheketoff* for Viengsaymay Chaleumphong.

*Loretta M. Lillios*, Assistant District Attorney, for the Commonwealth.

SPINA, J. The defendants, Viengsaymay Chaleumphong and Donnie Bouphavongsa, were convicted of the murder of Joshua Molina in the first degree on the theory of extreme atrocity or cruelty, and assault and battery of Juan Santana by means of a dangerous weapon. On appeal, Chaleumphong claims that the judge erred by (1) announcing during the third day of empanelment that he might seat fewer than sixteen jurors; (2) admitting vouching evidence, and permitting the prosecutor to vouch for witnesses during argument; (3) refusing to instruct on voluntary intoxication; (4) lowering the Commonwealth's burden in an instruction that permitted the jury to infer malice from consciousness of guilt; and (5) lowering the Commonwealth's burden by instructing the jury that the Commonwealth was not required to prove that, for purposes of joint venture, the defendant was aware that the killing was committed with extreme atrocity or cruelty, or that he desired the killing to be carried out in that manner. Bouphavongsa raises only the second and third issues in his appeal. Both defendants ask us to reduce their convictions under G. L. c. 278, § 33E. We affirm the convictions, and decline to exercise our power under G. L. c. 278, § 33E.

We summarize the facts the jury could have found, reserving other details for discussion of the issues. During the evening of November 20, 1997, the defendants and eight of their friends, most of whom were members of the Laos Boyz street gang in Lowell, were "hunting," a semimonthly exercise that involved attacks on members of rival gangs. They were driving around in two cars. At about 9:30 P.M. they encountered Joshua Molina, Juan Santana, and Johnny Lozada, who were walking on Bridge Street in Lowell. Chaleumphong, who was driving one of the cars, pulled alongside the three Hispanic youths. Someone in the car summoned Molina, who walked over and spoke briefly with one of the passengers, then walked away. Chaleumphong and his friends rejoined the other members of their group. They

decided to attack Molina and his friends because Bouphavongsa and Molina had had "problems" two years earlier.

They parked the cars out of sight a short distance up the street in the direction Molina and his friends were walking, then armed themselves with anything that could be used as a weapon. Chaleumphong had a claw hammer, and Bouphavongsa had a ball peen hammer. None of the others had hammers. The ten youths hid along the side of a diner and waited for Molina and his friends. Bouphavongsa served as lookout.

As Molina walked by the diner, he was knocked to the ground by one of the others, and Bouphavongsa then struck him in the face with a hammer. Molina curled in a fetal position, and lay motionless. Bouphavongsa continued to strike him, but there was no evidence that those blows were to the head. Others pummeled him with a shovel, fists, boards, and "The Club," an automobile antitheft device. Chaleumphong repeatedly struck Molina in the head with a hammer. Juan Santana was beaten senseless. He regained consciousness in a hospital, and eventually recovered from his wounds. Johnny Lozada had seen the attack coming and tried to warn his friends as he fled. The group of ten fled before police arrived.

Molina died three days later from his head wounds, of which there were nine, any one of which was life threatening. Each of the wounds was consistent with the blow of a hammer wielded with significant force. He suffered severe hemorrhaging and numerous skull fractures, many of which displayed a radiating fracture pattern. His brain protruded through a hole in his skull.

One of the attackers, Kamseng Varipath, spoke to the police, giving them their first real lead. The police approached two others, Somphone Xaysanasine and Steven Kounlabouth, and offered them "cooperation agreements." All three testified at trial. Varipath had not been charged, and he did not know whether he would be charged. Xaysanasine and Kounlabouth testified pursuant to plea agreements. Xaysanasine's plea agreement provided for a reduction of his murder charge to assault and battery by means of a dangerous weapon (shod foot), and a sentencing recommendation of house arrest, provided he testify truthfully. Kounlabouth's plea agreement provided that he would be charged with two counts of assault and battery by means of a

dangerous weapon and that a suspended sentence would be recommended in exchange for his truthful testimony.[2]

1. *Jury empaneling.* At the beginning of trial, the judge said he would seat sixteen jurors. He allotted each defendant twenty peremptory challenges, four more than provided under Mass. R. Crim. P. 20 (c) (1), 378 Mass. 889 (1979). On the afternoon of the third day of empaneling, after fourteen jurors had been seated, the judge brought up the subject of scheduling a view. He also mentioned the possibility of seating fewer than sixteen jurors, which drew no objection. As of that time Chaleumphong had exercised eleven of his challenges, and Bouphavongsa, twelve. Empaneling resumed, and a fifteenth juror was seated. The venire was depleted by the end of the day, by which time Chaleumphong had exercised a total of fourteen challenges, and Bouphavongsa, thirteen.

The judge announced that he was prepared to proceed with fifteen jurors. Counsel for Bouphavongsa asked the judge to seat a sixteenth juror, and when asked, conceded that proceeding with fifteen jurors would not result in any prejudice. Counsel for Chaleumphong objected, and claimed that his strategy would have been different if they had tried to seat sixteen jurors, adding that he had expedited his challenges. The judge then decided that he would seat sixteen jurors. The next day a sixteenth juror was seated. At the conclusion of empaneling, each defendant had six unused challenges.

Chaleumphong argues that the judge's decision to change the number of jurors from sixteen to a range of fourteen to sixteen impaired his use of peremptory challenges, denied him the benefits of State law on peremptory challenges, and diminished the value of the available challenges. In the absence of an objection, we review under the standard of a substantial likelihood of a miscarriage of justice. G. L. c. 278, § 33E. See *Commonwealth* v. *Beldotti*, 409 Mass. 553, 561 (1991). There was no error in the procedure followed by the judge. See *id.* Further, the judge found that no prejudice had been shown, and the rec-

---

[2]Four of the remaining five members of the group were charged with murder and other crimes; the fifth was charged with assault with intent to murder, and assault and battery by means of a dangerous weapon. Their trials were severed from this one.

ord supports his finding. The defendants had expressed satisfaction with each juror that was seated, and neither exhausted his peremptory challenges. Neither defendant has claimed that any juror was not impartial. See *Commonwealth* v. *Susi*, 394 Mass. 784, 789 (1985).

2. *Vouching issues.* (a) The defendants contend that during his testimony, Detective Joseph Murray improperly vouched for the credibility of Kounlabouth and Xaysanasine. Bouphavongsa's counsel cross-examined Murray about his disbelief of statements made by Kounlabouth during the investigation. Murray declined to answer, but counsel persisted. Murray explained that Kounlabouth's account seemed more truthful after he admitted hitting Santana with a piece of "The Club." Counsel pressed on, asking Murray if he had any way of knowing whether the cooperating witnesses were telling the truth. When Murray said that he did, counsel pointedly suggested that Murray could only know this if he had violated the sequestration order under which he was testifying. Murray responded that he only assumed they testified in a manner consistent with their grand jury testimony, otherwise there could be ramifications for them. There was no objection or motion to strike that testimony.

A witness may not express an opinion about the credibility of another witness. See *Commonwealth* v. *Triplett*, 398 Mass. 561, 567 (1986). Where a witness testifies pursuant to a plea agreement that is contingent on the witness's truthful testimony, as here, particular attention is required to avoid any suggestion that "the plea agreement . . . itself . . . [is] an implied representation by the government that the witness's testimony will be truthful." *Commonwealth* v. *Ciampa*, 406 Mass. 257, 266 (1989). We established certain procedures in *Ciampa* for judges and prosecutors to prevent the introduction of the potential prejudice surrounding the admission of plea agreements. Because police witnesses may also introduce that prejudice by vouching for cooperating witnesses testifying pursuant to plea agreements, the proscription against vouching discussed in *Commonwealth* v. *Ciampa, supra* at 265, should extend to them as well.

Murray's testimony did not constitute "vouching." His testimony had not been elicited by the prosecutor, which, if it

had, might have constituted vouching. There is no indication that Murray intentionally tried to frustrate counsel's examination with unresponsive and gratuitous remarks. It appears that Murray tried to avoid any vouching and limited the scope of his answers to the questions asked. It was defense counsel's insistence on knowing whether Murray had any way of knowing whether the cooperating witnesses were telling the truth that produced the answer. This was no mishap. The questions were part of a well-conceived strategy in which defense counsel suggested that the police and the prosecution had jumped to conclusions to solve the case, made bad deals with members of the group who were most culpable, then contaminated the investigation and the trial by coaching the witnesses and giving them opportunities to concoct matching stories to avoid murder charges. The defense strategy was reasonable, especially where the defendants were not claiming that they were not among the attackers. See *Commonwealth* v. *Coonan,* 428 Mass. 823, 827 (1999); *Commonwealth* v. *Adams,* 374 Mass. 722, 728 (1978).

Moreover, there was little or no risk to Bouphavongsa from the questions, regardless of the answers Murray might give. If Murray answered that he had no way of knowing whether the witnesses were truthful, counsel could argue that the Commonwealth struck a bad deal because it had no way of knowing who was telling the truth; if Murray answered as he did, counsel could reasonably expect that the answer would pit Murray against the judge, who probably would instruct the jury in accordance with *Commonwealth* v. *Ciampa, supra* at 266, that the government had no way of knowing if the witnesses were telling the truth, and Murray would become vulnerable to the suggestion that he violated the sequestration order, thereby lending support to the defense claim that the police had contaminated the investigation. Counsel could have determined that any risk was outweighed by the support he could obtain for the defense strategy. See *Commonwealth* v. *Drumgold,* 423 Mass. 230, 263 (1996) (not unreasonable risk for counsel to show witness photograph of his client before trial because any in-court identification would be weakened where witness had previously failed to identify his client from array of photographs); *Commonwealth* v. *Williams,* 30 Mass. App. Ct. 543, 548 (1991) (not

unreasonable for counsel to elicit otherwise inadmissible testimony of victim's state of mind where it could be used to corroborate defendant's insanity defense). The defendants may not now be heard to cry foul over evidence that they purposefully introduced and tried to use to their advantage. See *Commonwealth* v. *Coonan,.supra.* There was no error, and there was no substantial likelihood of a miscarriage of justice arising out of counsel's strategy. G. L. c. 278, § 33E. See *Commonwealth* v. *Wright*, 411 Mass. 678, 681-682 (1992).

(b) The defendants argue that a former assistant district attorney assigned to the investigation, who was called as a Commonwealth witness, improperly vouched for the credibility of the cooperating witnesses during his testimony. See *Commonwealth* v. *Ciampa, supra* at 265. As a preliminary matter, the Commonwealth argues that our *Ciampa* decision does not apply because the assistant district attorney was subject to cross-examination. *Id.* at 260. We have never said that cross-examination, per se, cures improper vouching for a witness testifying under the influence of a plea agreement. Cross-examination may alleviate the prejudicial effects of such vouching, but, as we have indicated, *supra* at 74, the potential prejudice in the evidentiary use of plea agreements may be released by a police witness who is involved in the investigation. Although the assistant district attorney did not testify as a police officer, his involvement in the investigation in an official capacity requires us to give his testimony similar scrutiny.

The assistant district attorney's testimony, given over the objections of both defendants, was closely monitored by the judge to ensure there would be no vouching. His testimony was limited to an accounting of what he said to the cooperating witnesses, and the actions he took as to each during the course of the investigation. He merely outlined the history of the investigation to rebut insinuations of defense counsel that the investigation was result oriented. He did not express his personal belief in the credibility of any witness, or suggest that he had special information at his disposal from which he could verify the truthfulness of their testimony. The judge properly denied motions to strike the direct examination of the assistant district attorney, or alternatively, for a mistrial. The testimony was an

appropriate response to the defense strategy, and it did not constitute vouching. *Commonwealth* v. *Ciampa, supra*. There was no error.

Chaleumphong further claims that the assistant district attorney improperly vouched for the cooperating witnesses during cross-examination by Bouphavongsa's counsel when he stated, "In a perfect world, they all would have gotten charged with murder." There was no objection or motion to strike the remark. It did not constitute vouching. Cf. *Commonwealth* v. *Brousseau*, 421 Mass. 647, 653 & n.5 (1996) (prosecutor's statement, "It's also true in life, you only play the cards that you're dealt," not improper under *Ciampa*).

(c) There is no merit to Chaleumphong's claim that the judge should have given a requested limiting instruction after the assistant district attorney's testimony to the effect that the Commonwealth has no way of determining whether a witness is truthful. See *Commonwealth* v. *Ciampa, supra* at 266. No limiting instruction was required because there had been no vouching testimony either by the assistant district attorney or by Detective Murray. Moreover, the judge recognized that the timing of the requested instruction, if given, could be perceived by the jury as his enlistment onto the defense team in these unusual circumstances. There was no error.

The judge's final instruction tracked the requirements of *Commonwealth* v. *Ciampa, supra* at 266. He forcefully instructed the jury that the credibility of the witnesses was a matter for them alone to decide, not the police or the prosecutor. He told them that prosecutors or police have no special methods of determining who is truthful or not. He also cautioned them to weigh with care the credibility of the witnesses who were testifying pursuant to plea agreements. There was no error.

(d) Chaleumphong argues, very briefly, that a portion of the prosecutor's closing argument constitutes improper vouching. The prosecutor was responding to Chaleumphong's counsel's closing argument where he implied that the police were duped by Varipath, who had said he came forward because "it was the right thing to do," and to Bouphavongsa's counsel's closing argument where he stated that the police rushed to judgment because they were overworked. His point simply was that it was

ludicrous to think that the police were duped by persons so obviously unintelligent as the cooperating witnesses. Bouphavongsa's counsel had made a similar observation about the cooperating witnesses in his closing argument. The prosecutor did not express his personal belief in the credibility of any witness or indicate that he had special knowledge to determine credibility. *Commonwealth* v. *Ciampa, supra* at 265. His argument was fair comment.

3. *Failure to instruct on voluntary intoxication.* The judge refused to instruct the jury on voluntary intoxication, as requested. An instruction on voluntary intoxication is not required absent evidence of "debilitating intoxication." *Commonwealth* v. *Erdely*, 430 Mass. 149, 152 (1999), quoting *Commonwealth* v. *James*, 424 Mass. 770, 789 (1997). The evidence here is insufficient. Although Kounlabouth testified that Bouphavongsa was "drunk," he qualified his use of the word as meaning "happy," "[h]yper," and "[f]eeling good." Similarly, Xaysanasine explained his use of the word "buzzed" when describing both defendants as meaning "happy." Varipath testified that Chaleumphong did not appear drunk, and that Bouphavongsa was "somewhat" drunk. Apart from evidence that the defendants may have consumed beer and hard liquor prior to the killing, there was no evidence of debilitating intoxication. The evidence "did not support a reasonable inference that they were so intoxicated at the time of the killing that they could not form the requisite criminal intent." *Commonwealth* v. *James*, 424 Mass. 770, 789 (1997). There was no error.

4. *Instruction on consciousness of guilt.* Chaleumphong argues that the judge's instruction on consciousness of guilt, which he concedes conformed with *Commonwealth* v. *Toney*, 385 Mass. 575, 585-586 n.6 (1982), invited the jury to infer malice aforethought and thereby reduced the Commonwealth's burden of proof. The judge correctly instructed the jury on malice aforethought in the context of extreme atrocity or cruelty. See *Commonwealth* v. *Judge*, 420 Mass. 433, 437 (1995). There was no objection to the instruction on consciousness of guilt, so we review under the standard of a substantial likelihood of a miscarriage of justice.

Although the judge did not expressly forbid the jury from inferring malice aforethought from evidence of consciousness of guilt, it would have been illogical for them to have done so where the instructions adequately alerted them to the distinctions between the two concepts. Disposition of this issue is controlled by *Commonwealth* v. *Cohen*, 412 Mass. 375, 392-393 (1992). There was no error. The evidence of malice was, in any event, overwhelming, and the failure to give the instruction did not create a substantial likelihood of a miscarriage of justice. *Id.*

5. *Instruction on joint venture.* The judge instructed the jury that, if the Commonwealth proved beyond a reasonable doubt that either or both defendants "participated in a joint venture with another person to commit an unlawful homicide while sharing that other person's mental state of malice aforethought, and the Commonwealth also proved that the other person committed the unlawful homicide with extreme atrocity or cruelty," then they would be warranted in returning a guilty verdict as to such defendant of murder in the first degree as a joint venturer. The judge added that "[i]t is not necessary for the Commonwealth to prove that [the defendants] had a conscious awareness that the acts were being committed with extreme atrocity or cruelty or that either of them desired the acts to be carried out in that manner." Chaleumphong contends that this instruction erroneously relieved the Commonwealth of its burden of proving the element of extreme atrocity or cruelty because some of the factors the jury were required to consider on the question of extreme atrocity or cruelty involved a determination of his mental state.

We have consistently held that "proof of malice aforethought is the only requisite mental intent for a conviction of murder in the first degree based on murder committed with extreme atrocity or cruelty." *Commonwealth* v. *Cunneen*, 389 Mass. 216, 227 (1983), and cases cited. In that case, we rejected the argument that an element of murder by extreme atrocity or cruelty is a defendant's knowledge that his acts were extremely atrocious or cruel. *Id.* at 226-228. If the Commonwealth has no burden to prove that a defendant who acted alone knew that his acts were extremely atrocious or cruel, then it has no such burden where

the defendant acts in a joint venture. See *Commonwealth* v. *Podlaski,* 377 Mass. 339, 347 (1979), and cases cited.

Chaleumphong's reliance on *Commonwealth* v. *Gould,* 380 Mass. 672 (1980), and *Commonwealth* v. *Perry,* 385 Mass. 639 (1982), is misplaced. Our holdings in *Commonwealth* v. *Gould, supra* at 685, that the jury may consider "the effect of the defendant's serious, long-standing mental illness," and in *Commonwealth* v. *Perry, supra* at 649, that the jury may consider the defendant's intoxication, did not establish a mens rea requirement as to the element of extreme atrocity or cruelty. Those decisions merely added a defendant's impaired mental capacity as "an additional factor which the jury should consider in determining whether the murder was committed with extreme atrocity or cruelty." *Commonwealth* v. *Cunneen, supra* at 228. There was no error.

6. *Relief under G. L. c. 278, § 33E.* We have considered for the benefit of both defendants all arguments made by one defendant alone. We have reviewed the entire record, the transcripts, the briefs, and the arguments. We decline to reduce the convictions or order a new trial.

The defendants set out with their friends to inflict serious harm on unsuspecting persons who had caused them past inconvenience. They ambushed Joshua Molina and brutally beat him with crude weapons. After beating him, the ten drove to a nearby fast food restaurant, ate hamburgers and regaled in the success of their "hunt." Bouphavongsa recalled his encounter with Molina two years earlier, adding that this time he was "fucking him up . . . getting him good." Chaleumphong boasted that he "got them good," "bashing that mother fucker." The next night he said he "fucked up them Spics with a hammer."

*Judgments affirmed.*