NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-12005

COMMONWEALTH  vs.  JAMES S. WINQUIST.

Plymouth.     March 8, 2016. - June 14, 2016.

Present:  Gants, C.J., Spina, Cordy, Botsford, Duffly, Lenk, &
Hines, JJ.

Homicide.  Joint Enterprise.  Evidence, Hearsay, Common criminal
    enterprise, Joint venturer, Statement of codefendant.
    Practice, Criminal, Hearsay.

Indictments found and returned in the Superior Court
Department on September 28, 2007.

The cases were tried before Richard J. Chin, J.

After review by the Appeals Court, the Supreme Judicial
Court granted leave to obtain further appellate review.

Leslie W. O'Brien for the defendant.
Mary E. Lee, Assistant District Attorney, for the
Commonwealth.

SPINA, J.  On May 9, 2005, the badly decomposed bodies of

two homeless men, subsequently identified as William Chrapan and

David Lyon, were discovered inside an abandoned ammunition

bunker located in Bare Cove Park in Hingham.  The cause of death

for each man was blunt force trauma and "semi-sharp" injuries to the head. In addition, Chrapan was missing his right hand, which was found two months later by two men walking their dogs in Bridgewater. The defendant, James S. Winquist, was indicted by a grand jury on September 28, 2007, on two counts of murder, G. L. c. 265, § 1. Following a jury trial in the Superior Court in September, 2012, he was convicted of two counts of murder in the second degree. The defendant was sentenced to concurrent terms of life in prison. On appeal, he argued that (1) two out-of-court statements made by Eric Snow,[1] a purported joint venturer in the murders, were erroneously admitted against the defendant under the joint venture exception to the hearsay rule;[2] (2) the trial judge erred in denying his midtrial request for a hearing pursuant to Franks v. Delaware, 438 U.S. 154 (1978); (3) the prosecutor's closing argument was improper; and (4) a key witness was incompetent to testify. The Appeals Court affirmed the judgments. Commonwealth v. Winquist, 87 Mass. App. Ct. 695,

---

[1] Approximately six months before the start of the defendant's trial, Eric Snow, who also was charged with two counts of murder, committed suicide in jail. This fact was not introduced in evidence at the defendant's trial.

[2] "Under the joint venture exception to the hearsay rule, '[o]ut-of-court statements by joint criminal venturers are admissible against the others if the statements are made during the pendency of the criminal enterprise and in furtherance of it.'" Commonwealth v. Hardy, 431 Mass. 387, 393 (2000), S.C., 464 Mass. 660, cert. denied, 134 S. Ct. 248 (2013), quoting Commonwealth v. Clarke, 418 Mass. 207, 218 (1994). See Mass. G. Evid. § 801(d)(2)(E) & notes (2015).

696 (2015). We granted the defendant's application for further appellate review, limited to the issue of the admissibility of Snow's out-of-court statements. As to that issue, we conclude that the statements properly were admitted.[3]

1. Background. The facts as they could have been found by the jury are set forth in the decision of the Appeals Court. See id. at 696-699. We reiterate the pertinent details.

Snow and the defendant were members of the "Brotherhood of Blood" (Brotherhood), a small neo-Nazi group of friends that "look[ed] out for each other" and shared "white pride beliefs." One day in April, 2005, the defendant, his girl friend, Snow, and Kelly Burgess, a woman with whom Snow and the defendant were friends, were walking in Bare Cove Park when they encountered Chrapan and Lyon. When Burgess offered them some money to buy coffee, Snow slapped the money from her hand and made disparaging comments about the two homeless men.

A day or two later, at around 11 P.M., Snow asked Burgess to drive him and the defendant down the street. She gave them a ride to a grocery store parking lot that was across the street from Bare Cove Park, and Snow asked her to return thirty minutes later to pick them up. Within a few minutes of Burgess's return to the parking lot, Snow and the defendant emerged from Bare

---

[3] With regard to the other issues raised by the defendant before the Appeals Court, the decision of the Appeals Court is final and binding.

Cove Park and got into Burgess's motor vehicle. She drove them back to the defendant's house, where they all went downstairs to the basement.

Burgess saw that Snow was covered in blood, and the defendant had blood on the bottom of his pants and boots. Each man was carrying a baseball bat; bloody spikes protruded from the bat in Snow's hands. Snow and the defendant changed clothes, putting their bloody clothes and the bats in a bag on the floor. Snow told the defendant to "get rid of them," and the defendant responded that he would. Burgess asked Snow what he was talking about, and he replied that it was none of her business. Shortly thereafter, right before Snow and Burgess left the house, Burgess heard Snow tell the defendant that he (the defendant) had "made his bones." Among members of the Brotherhood, this expression referred to "killing somebody, putting in work that would prove you were worthy" of membership in the group. Burgess proceeded to drive Snow to his mother's house in Bridgewater, behind which Snow buried a bag containing a human hand. Then, they parted company. Several weeks later, the defendant telephoned Burgess and told her that two bodies had been found in Bare Cove Park.

In December, 2006, Snow, who was then in prison serving an unrelated sentence, wrote a letter to the defendant expressing his concern that Burgess, whom he referred to as "Bigfoot," was

plotting against them, and stating that "she obviously knows way too much and needs to be taken under soil."[4]  Snow also stated that Burgess was "the type of individual that sold her own kids out for crack," and that "hopefully we'll get lucky and they'll just die on their own."  On April 26, 2007, Snow wrote another letter to the defendant on the occasion of the second anniversary of the murders.  In this letter, Snow wrote, "You made your bones while the rest smoked them."  Suspecting that certain of their friends wanted "to see [them] go down for eternity" and were planning to tell the police about the murders, Snow also wrote, "[W]e know who the real threats are and what needs to become of them."  He provided the defendant with the address of Burgess and her roommate, Jack Amaral, on East Main Street in Brockton, and he instructed the defendant to "make sure you take out [Amaral's son] as well."

One evening in June, 2007, the defendant drove to the address provided by Snow.  Amaral observed the defendant parking his vehicle and opening its trunk, in which he saw a white, five-gallon bucket.  Amaral ran down the stairs from his third-floor apartment, and as the defendant, who had nothing in his hands, started to climb up the stairs, Amaral confronted him.

---

[4] This letter and many others were discovered on September 6, 2007, during a search of the defendant's bedroom at his parents' home in Weymouth.  The defendant had been arrested the prior month.

The defendant told Amaral that Snow had sent him there to burn down the house because Snow had concerns about Burgess. The defendant also told Amaral that he could not go through with it because Amaral's son was in the apartment.

At trial, the theory of the defense was that although the defendant had accompanied Snow to Bare Cove Park and was present when Snow purportedly killed Chrapan and Lyon, he did not participate in the murders. To counter this defense, the Commonwealth sought to introduce, among other evidence, the two statements made by Snow that the defendant had "made his bones." The Commonwealth sought to admit one of these statements through the testimony of Burgess, and the other by way of the April 26, 2007, letter from Snow to the defendant. The defendant objected. The judge ruled that the statements were admissible because they were made during a joint venture as part of an ongoing effort to conceal the crime. After being instructed on murder in the first degree on theories of extreme atrocity or cruelty and deliberate premeditation, murder in the second degree, and joint venture liability, the jury convicted the defendant of two counts of murder in the second degree.

2. Admission of Snow's statement in April 26, 2007, letter. The defendant first challenges the admission of Snow's statement in his April 26, 2007, letter to the defendant that he (the defendant) had "made [his] bones." In the defendant's

view, the judge erred in admitting this statement because it was not made during a cooperative effort to murder Chrapan and Lyon, or soon thereafter. We conclude that, in the circumstances of this case, even though the letter was written nearly two years after the murders, the joint venture remained ongoing, and, therefore, the challenged statement was properly admitted.[5]

"Out-of-court statements by joint venturers are admissible against the others if the statements are made during the pendency of the criminal enterprise and in furtherance of it."[6] Commonwealth v. Carriere, 470 Mass. 1, 8 (2014), quoting Commonwealth v. Burton, 450 Mass. 55, 63 (2007). See Commonwealth v. Bongarzone, 390 Mass. 326, 340 (1983). See also Mass. G. Evid. § 801(d)(2)(E) & notes (2015). The admissibility of such statements is premised on a belief that common interests and activities among coventurers during a criminal enterprise tend to ensure the reliability of their statements to one another. See Commonwealth v. White, 370 Mass. 703, 712 (1976). In essence, "the statement of each joint venturer is equivalent to a statement by the defendant." Commonwealth v. Stewart, 454

---

[5] "[T]he question whether an out-of-court statement satisfies an exception to the hearsay rule is one for the judge alone." Commonwealth v. Bright, 463 Mass. 421, 428 (2012).

[6] Generally speaking, the statements of joint venturers are the type of remarks that are deemed nontestimonial under Crawford v. Washington, 541 U.S. 36, 56 (2004). See Commonwealth v. Carriere, 470 Mass. 1, 8-9 (2014); Commonwealth v. Burton, 450 Mass. 55, 63-64 (2007).

Mass. 527, 535 (2009). "Before statements by coventurers may be admitted, the Commonwealth first must establish the existence of the joint venture (and the defendant's involvement in it) by a preponderance of the evidence, independent of the out-of-court statements." Carriere, supra. See Commonwealth v. Cruz, 430 Mass. 838, 844 (2000). "If the judge is satisfied that the Commonwealth has met this burden, the statement may be admitted, and the jury are instructed that they may consider the statements only if they find that a joint venture existed independent of the statements, and that the statements were made in furtherance of that venture."[7] Carriere, supra, and cases cited.

"A joint venture is established by proof that two or more individuals 'knowingly participated in the commission of the crime charged . . . with the intent required for that offense.'" Commonwealth v. Bright, 463 Mass. 421, 435 (2012), quoting Commonwealth v. Zanetti, 454 Mass. 449, 466 (2009). "[W]e view the evidence presented to support the existence of a joint venture 'in the light most favorable to the Commonwealth,' recognizing also that the venture 'may be proved by circumstantial evidence.'" Bright, supra, quoting Commonwealth v. Braley, 449 Mass. 316, 320 (2007), and cases cited. A

---

[7] The judge in this case properly instructed the jury regarding the consideration of statements made by purported joint venturers.

judge's determination as to the existence and scope of a joint venture is reviewed under the abuse of discretion standard.  See Commonwealth v. Angiulo, 415 Mass. 502, 520 (1993).

As an initial matter, we conclude that the judge here did not abuse his discretion in determining that the Commonwealth had established, by a preponderance of the evidence, a joint venture between Snow and the defendant to murder Chrapan and Lyon.  Snow had made disparaging comments about two homeless men when he and the defendant first encountered them in Bare Cove Park.  A day or two later, Snow asked Burgess to drive him and the defendant to the vicinity of Bare Cove Park late at night, and then return for them in thirty minutes.  When Burgess picked them up, Snow and the defendant had blood on their clothes and they were carrying baseball bats, one of which had bloody spikes protruding from its surface.  Snow told the defendant to get rid of these items, and the defendant said that he would.  Snow proceeded to bury behind his mother's house a bag containing a human hand.  Several weeks later, the badly decomposed bodies of two men, one of whom was missing a hand, were found in an abandoned ammunition bunker in Bare Cove Park.  The defendant telephoned Burgess and informed her of the discovery.  Based on the entirety of this evidence, the Commonwealth satisfied its burden of proof as to the existence of a joint venture.  The question then becomes whether the out-of-court statement made by

Snow in his April 26, 2007, letter exceeded the scope of the joint venture.

It is well established that the joint venture exception to the hearsay rule does not apply to statements made after the joint venture has ended. See Commonwealth v. Colon-Cruz, 408 Mass. 533, 543 (1990) (criminal enterprise ended when joint venturer apprehended). See also Stewart, 454 Mass. at 537. "At that point, the joint venturers no longer share the commonality of interests which is some assurance that their statements are reliable." Colon-Cruz, supra. See Bongarzone, 390 Mass. at 340. However, "[s]tatements made in an effort to conceal a crime, made after the crime has been completed, may be admissible under the joint venture exception because the joint venture [remains] ongoing, with a purpose to ensure that the joint venture itself remains concealed." Carriere, 470 Mass. at 11. See Commonwealth v. Freeman, 430 Mass. 111, 117 (1999) (statements made subsequent to crime when coventurers are attempting to evade arrest are admissible); Colon-Cruz, supra at 545 (where joint venturers attempted to conceal evidence of crime and to avoid detection and detention, interests "still were closely bound together, tending to ensure the reliability of their statements"). In essence, the inquiry to determine whether a statement was made during the pendency of a criminal enterprise and in furtherance of it "focuses not on whether the

crime has been completed, but on whether a joint venture was continuing." Stewart, supra, citing Braley, 449 Mass. at 322. "Absent clear indication that the venture [has] ended, it is reasonable to infer that concealment of the venture [is] ongoing." Stewart, supra.

Generally speaking, as the defendant points out, our appellate courts thus far have deemed admissible statements made by joint venturers during the so-called concealment phase of their criminal enterprise when such phase is relatively close in time to the commission of the crime. See, e.g., Bright, 463 Mass. at 425, 436-437 (statements made "in the days following the shooting" regarding efforts to conceal crime were admissible); Angiulo, 415 Mass. at 506-507, 518-520 (statements made approximately three weeks after murder urging associates to keep silent deemed admissible where joint venture not yet terminated when statements made); Commonwealth v. Ali, 43 Mass. App. Ct. 549, 562 (1997) (statements made "during the four days following the crime" supported inference that joint criminal enterprise had not ended and were admissible). Cf. Commonwealth v. Rankins, 429 Mass. 470, 474 (1999) (letter written by coconspirator to defendant approximately three months after conspiracy began but two years before murder committed was admissible). However, as we have pointed out, the relevant consideration is not whether the statements of a joint venturer

were made close in time to the commission of a crime, but whether the joint venture remained ongoing at the time the statements were made.

Here, notwithstanding the fact that nearly two years had elapsed between the commission of the murders and Snow's statement to the defendant in his April 26, 2007, letter that the defendant had "made [his] bones," the two men remained actively engaged in an effort to conceal their involvement in the crimes and thereby evade arrest. In his December, 2006, letter to the defendant, Snow expressed his concerns that Burgess knew too much, was plotting against them, and "need[ed] to be" buried. In his subsequent letter to the defendant in April, 2007, Snow provided Burgess's address and gave the defendant instructions to burn down her house. A month or two later, the defendant went to Burgess's home and told her roommate why he was there, although the defendant ultimately decided that he was unable to commit the act of arson. Based on these circumstances, we conclude that there was sufficient evidence to support the judge's determination that the joint venture remained ongoing at the time Snow wrote to the defendant that he (the defendant) had "made [his] bones." Although it was made a significant period of time after the murders of Chrapan and Lyon, this statement was not outside the scope of the joint

venture.  Accordingly, the judge did not abuse his discretion in admitting Snow's statement.

Relying on Krulewitch v. United States, 336 U.S. 440 (1949), and Grunewald v. United States, 353 U.S. 391 (1957), the defendant urges this court not to broaden the scope of admissibility of out-of-court statements made by joint venturers during the concealment phase of a criminal enterprise. Acknowledging that the framers of the United States Constitution intended to "afford the States flexibility in their development of hearsay law," Crawford v. Washington, 541 U.S. 36, 68 (2004), the defendant nonetheless asserts that under Federal law, statements made during the concealment phase of a criminal enterprise are not admissible because, among other reasons, permitting such statements would improperly expand a narrow exception to the hearsay rule.  In the defendant's view, the inference of reliability loses whatever force it may have when it is stretched to include, years after the completion of a crime, "desperate attempts to cover up after the crime begins to come to light."  Grunewald, supra at 403.

In Krulewitch, a case alleging conspiracy to transport a woman across State lines for the purpose of prostitution, the United States Supreme Court concluded that a hearsay statement attributed to one purported coconspirator was not admissible against another where the alleged conspiracy, if it ever

existed, had ended and the coconspirators had been arrested before the hearsay statement was made. Krulewitch, 336 U.S. at 441-443. The government argued for the admissibility of the hearsay statement "as one in furtherance of a continuing subsidiary phase of the conspiracy," namely concealment in order to prevent detection, conviction, and punishment. Id. at 443. The Court was not persuaded to expand its narrow exception to the hearsay rule for statements made in furtherance of a charged conspiracy, declining to hold admissible "a declaration, not made in furtherance of the alleged criminal transportation conspiracy charged, but made in furtherance of an alleged implied but uncharged conspiracy aimed at preventing detection and punishment." Id. at 443-444. See Lutwak v. United States, 344 U.S. 604, 617-618 (1953). To the extent that the Supreme Court held that the hearsay statement was not admissible because it was not made pursuant to and in furtherance of the objectives of the charged conspiracy, Krulewitch is not inconsistent with our conclusions in the present case.

The defendant's reliance on Grunewald is similarly misplaced. In that case, three petitioners were convicted of conspiracy to defraud the United States with regard to certain tax matters. Grunewald, 353 U.S. at 393. One of the questions before the Court was whether the prosecution was barred by the applicable three-year statute of limitations. Id. at 396. The

Court declined to adopt the government's theory that an agreement to conceal a conspiracy after the accomplishment of its criminal purpose can be deemed part of the conspiracy and, therefore, can extend its duration for purposes of the statute of limitations.  Id. at 398-399, 402, 406.  Sanctioning such a theory, the Court reasoned, "would for all practical purposes wipe out the statute of limitations in conspiracy cases, as well as extend indefinitely the time within which hearsay declarations will bind co-conspirators."  Id. at 402.  The Court distinguished between "acts of concealment done in furtherance of the main criminal objectives of the conspiracy," which are necessary for its successful accomplishment, and "acts of concealment done after these central objectives have been attained, for the purpose only of covering up after the crime" (emphasis in original).  Id. at 405.

Here, the challenged statement in Snow's letter dated April 26, 2007, was not made after his criminal enterprise with the defendant had been accomplished.  Rather, the statement was part and parcel of their ongoing joint venture to murder Chrapan and Lyon, to conceal their involvement in the crimes, and to avoid detection and arrest by eliminating a potential witness who knew too much about their activities.  The concern expressed by the Supreme Court in Grunewald, 353 U.S. at 402, that expanding the life of a conspiracy effectively would eliminate the statute of

limitations in conspiracy cases, has no bearing on the present case given that there is no statute of limitations in a murder case.  See G. L. c. 277, § 63 ("An indictment for murder may be found at any time after the death of the person alleged to have been murdered"); Commonwealth v. Dixon, 458 Mass. 446, 455 n.21 (2010) ("The Legislature has declined to enact a statute of limitations for murder").  Cf. Dutton v. Evans, 400 U.S. 74, 80-83 (1970) (plurality opinion) (policy considerations pertaining to hearsay exception in Federal conspiracy trials that preclude out-of-court statements made when conspirators are engaged in nothing more than concealment of criminal enterprise have no bearing on State prosecution for substantive offense of murder).

That said, this court is cognizant of the fact that the commonality of interests among joint venturers may change over an extended period of time, potentially diminishing the reliability of their statements.  We caution that our decision today should not be interpreted as simply extending indefinitely the time within which the out-of-court statements of joint venturers may be admissible against each other.  A trial judge must give careful consideration to whether such statements actually were made "both during the pendency of the cooperative effort and in furtherance of its goal."  Colon-Cruz, 408 Mass. at 543, quoting White, 370 Mass. at 708-709.  This requires a fact-intensive analysis.  Here, the judge did not err in

determining that the specific facts concerning the joint venture between Snow and the defendant warranted the admission of Snow's statement that the defendant had "made [his] bones," expressed nearly two years after the commission of the murders.

3. Admission of Burgess's testimony. The defendant also challenges the admission of Burgess's testimony that she heard Snow tell the defendant in the immediate aftermath of the murders that he (the defendant) had "made his bones." In the defendant's view, this statement was not made in furtherance of an ongoing joint venture, and the judge's conclusion to the contrary was based on speculation. The defendant also contends that Snow's statement was not admissible because it was made in Burgess's presence, potentially revealing the crimes to an uninvolved third party. We disagree with the defendant's arguments.

Snow's statement to the defendant was made right after the men returned to the defendant's home from Bare Cove Park and prepared to dispose of their bloody clothes and weapons. The judge reasonably could infer that Snow made the statement to praise the defendant for his participation in the murders, to reinforce the men's trust in and loyalty to each other, and to encourage the defendant's active participation in the concealment phase of their criminal enterprise. See Stewart, 454 Mass. at 537 (judge can infer existence of ongoing joint

venture in absence of clear indication that venture had ended). See also Burton, 450 Mass. at 62-64 (testimony regarding conversation that took place immediately after murder when joint venturers still were together, discussing what had happened, and when murder weapon was hidden in effort to evade detection deemed admissible); Colon-Cruz, 408 Mass. at 544-545 (declarations made after shooting deemed admissible where joint venture had not terminated given that coventurers "were attempting actively to conceal evidence of the shooting and to avoid detection and detention"). That being the case, the judge properly determined that Snow's statement was made in furtherance of his joint venture with the defendant and, therefore, was admissible.

We have said that the "'[c]onfessions or admissions of conspirators or joint venturers' to strangers or third parties unsympathetic to the goals of the venture 'are not admissible . . . as vicarious statements of the other members of the conspiracy or joint venture.'" Bright, 463 Mass. at 433 n.16, quoting Bongarzone, 390 Mass. at 340 n.11. Here, Snow did not confess anything or make any admissions to Burgess. Rather, he congratulated the defendant on his participation in the murders, and Burgess overheard their conversation. Furthermore, Burgess was not a stranger who was unsympathetic to the goals of the joint venture. To the contrary, Burgess was friendly with Snow

and the defendant, she drove them to and from Bare Cove Park, and she spent time with them in the defendant's basement as they prepared to get rid of incriminating evidence.  Burgess also assisted, perhaps unwittingly, in the disposal of Chrapan's severed hand.  The mere presence of third parties does not make the joint venture exception to the hearsay rule inapplicable.  See, e.g., Commonwealth v. Wood, 469 Mass. 266, 278-281 (2014) (statements made by joint venturer to girl friend on night of murder and several days later deemed admissible); Braley, 449 Mass. at 319-320 (once joint venture established, statements made by coventurer to girl friend in aftermath of shooting deemed admissible against defendant).

Judgments affirmed.