NOTICE: All slip opinions and orders are subject to formal revision and are superseded by the advance sheets and bound volumes of the Official Reports. If you find a typographical error or other formal error, please notify the Reporter of Decisions, Supreme Judicial Court, John Adams Courthouse, 1 Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-1030; SJCReporter@sjc.state.ma.us

SJC-12007

COMMONWEALTH vs. ETNID LOPEZ.

Bristol.     January 10, 2020. - August 20, 2020.

Present: Gants, C.J., Gaziano, Budd, Cypher, & Kafker, JJ.


Homicide. Joint Enterprise. Evidence, Joint venturer, Authentication, Admissions and confessions, Voluntariness of statement. Due Process of Law, Police custody. Constitutional Law, Admissions and confessions, Waiver of constitutional rights by juvenile, Voluntariness of statement. Practice, Criminal, Admissions and confessions, Voluntariness of statement, Instructions to jury, Assistance of counsel, Postconviction relief, Capital case.


Indictment found and returned in the Superior Court Department on October 1, 2010.

A pretrial motion to suppress evidence was heard by D. Lloyd Macdonald, J.; the case was tried before Robert J. Kane, J.; and motions for a new trial and for postconviction discovery, filed on June 30, 2017, were considered by Thomas F. McGuire, Jr., J.


Elizabeth Doherty for the defendant.
Tara L. Johnston, Assistant District Attorney, for the Commonwealth.

BUDD, J.  The defendant, Etnid Lopez, was convicted of murder in the first degree on a theory of extreme atrocity or cruelty in connection with the stabbing death of Tigan Hollingsworth.  We have consolidated the defendant's direct appeal with his appeals from the denial of his motions for a new trial and for postconviction discovery, and we now affirm.  After a full consideration of the entire record, we further decline to grant extraordinary relief pursuant to G. L. c. 278, § 33E.

Background.  We present the facts in the light most favorable to the Commonwealth, reserving certain details for discussion of specific issues.

At approximately 11:30 P.M. on June 25, 2010, the defendant, his girlfriend Kayla Lawrence, Jared Brown-Garnham (Garnham), and Michelle Torrey drove to a convenience store in Taunton.  The defendant wore a white T-shirt, and Garnham wore dark clothing with a blue bandana.  Upon arrival, the defendant entered the convenience store and Lawrence stood in the parking lot with Garnham.  While waiting for the defendant, Lawrence saw the victim and exchanged heated words with him.  Lawrence was familiar with the victim and had witnessed him, along with a group of other people, "jump" the defendant's brother, Jean

Carlos Lopez (Jean),[1] a few years earlier. Soon thereafter, the defendant came out of the store and, with a knife in his hand, began chasing the victim around the parking lot. Torrey got out of her vehicle and attempted to restrain the defendant, holding him back by his arms, but the defendant eventually broke free and continued to chase the victim. During this time, Jean and the defendant's uncle, Erving Cruz, drove into the parking lot. As Cruz got out of the vehicle, he pointed at the victim and shouted, "Is that him? Is that him? Get him." Cruz and Jean joined the defendant in chasing the victim around the parking lot. The victim then ran out of the parking lot and down the street.

Two witnesses, Brittany Machado and Matthew D'Alessandro, observed the events at the convenience store parking lot as they waited in their vehicle at a red light directly across the intersection. Both witnessed the victim flee down the street chased by two men: one in a white T-shirt, and the other, who had just got out of a vehicle in the parking lot, in a black tank top and baggy black clothes. Both witnesses observed the chase as they drove parallel to the three men. As they made a left turn into their driveway, the victim and his two pursuers almost hit their car. D'Alessandro witnessed the three males

---

[1] We refer to Jean Carlos Lopez by his first name because he shares a last name with the defendant.

turn back toward the convenience store before turning down a driveway one house down the street.

As Machado parked the car, they both heard the sound of the chain-link fence to their left clanging. D'Alessandro then saw the victim in his neighbor's back yard, illuminated by a motion-activated spotlight, followed by the man in the white T-shirt and the man in the black tank top. The two men then attacked the victim, holding him and hitting him. As the victim fell to the ground, D'Alessandro heard the man in the black tank top ask, "Did you get him? Did you get him?" The man in the white T-shirt responded, "Yes I got him." The two men then jumped over the fence and fled.[2]

The victim suffered from thirteen stab wounds, several of which penetrated his chest cavity. His cause of death was collapsed lungs and massive blood loss.

The defendant's theory at trial was that Garnham was the killer. He relied primarily on Lawrence's testimony that Garnham had participated in the attack and left the back yard "a few seconds" after the defendant. Lawrence further testified that following the stabbing, Garnham threatened to kill Lawrence

---

[2] In separate trials, Erving Cruz was convicted of murder in the second degree in connection with the stabbing death. Commonwealth v. Cruz, 97 Mass. App. Ct. 1102 (2020). Jean was convicted of murder in the first degree; however, his conviction subsequently was overturned on appeal. Commonwealth v. Lopez, 484 Mass. 211 (2020).

and her daughter, just as he had killed the victim, if Lawrence mentioned his name to police. The defendant also called Garnham's brother, and the brother's fiancée, both of whom testified that Garnham admitted being involved in the attack.

Discussion. The defendant argues that the statements he made to police, text messages sent after the stabbing, and statements attributed to Cruz improperly were admitted in evidence. He also contends that the trial judge erred in declining to instruct the jury on involuntary manslaughter. Finally, he argues that his motion for a new trial was denied improperly.

1. Coventurer statements. At trial, over the defendant's objection, D'Alessandro testified that, as the defendant and Cruz[3] pursued the victim around the convenience store parking lot, Cruz shouted, "Is that him? Is that him? Get him." Soon thereafter, from his driveway, D'Alessandro observed the defendant and Cruz in the back yard of the house next door repeatedly striking the victim. D'Alessandro testified that, as the victim fell to the ground, he heard the individual later identified as Cruz ask, "Did you get him? Did you get him?" and

---

[3] Matthew D'Alessandro did not identify the defendant or Cruz; rather, he described observing and hearing a man wearing a white T-shirt and a man wearing a black tank top. Kayla Lawrence identified these individuals as the defendant and Cruz, respectively.

heard the other individual, later identified as the defendant respond, "Yes I got him."  D'Alessandro then saw the two attackers climb the chain-link fence and flee the scene.  The defendant contends that the judge erred in admitting Cruz's statements under the hearsay exemption for statements made by a coventurer.[4]  We perceive no error.

It is well established that "[o]ut-of-court statements by joint venturers are admissible against the others if the statements are made during the pendency of the criminal enterprise and in furtherance of it."  Commonwealth v. Winquist, 474 Mass. 517, 520-521 (2016), quoting Commonwealth v. Burton, 450 Mass. 55, 63 (2007).  See Mass. G. Evid. § 801(d)(2)(E) (2020).  Before admitting a coventurer's statement, a judge must make a preliminary determination that the Commonwealth has established by a preponderance of the evidence, other than the out-of-court statement itself, that a joint venture existed

---

[4] The defendant does not challenge the admission of Cruz's statements on the ground that they were testimonial statements the admission of which violated the defendant's right to confront witnesses against him.  See generally Crawford v. Washington, 541 U.S. 36, 59 (2004).  Even if he had made this argument, we have recognized that, "[g]enerally speaking, the statements of joint venturers are the type of remarks that are deemed nontestimonial under Crawford."  Commonwealth v. Winquist, 474 Mass. 517, 521 n.6 (2016), and cases cited.  See Commonwealth v. Wardsworth, 482 Mass. 454, 464 (2019) ("Testimonial statements are those made with the primary purpose of 'creating an out-of-court substitute for trial testimony'" [citation omitted]).

between the declarant and the defendant, and that the statement was made in furtherance of that venture. See Commonwealth v. Rakes, 478 Mass. 22, 37 (2017); Winquist, supra at 521. If the judge finds that the Commonwealth has met this preliminary burden, the statement may be admitted, but the judge must instruct the jury that they may only consider the statement as evidence of guilt if the jury make "their own independent determination, again based on a preponderance of the evidence other than the statement itself, that a joint venture existed and that the statement was made in furtherance thereof." Rakes, supra. On appeal, we review the judge's preliminary determination that a coventurer statement is admissible for an abuse of discretion. Id. In doing so, "we view the evidence presented to support the existence of a joint venture in the light most favorable to the Commonwealth, recognizing also that the venture may be proved by circumstantial evidence." Commonwealth v. Bright, 463 Mass. 421, 435 (2012).

Here, the judge made the requisite preliminary findings at sidebar before admitting each statement.[5] The judge also

---

[5] The judge made preliminary findings based on the evidence already admitted before the Commonwealth sought to elicit the challenged testimony. Alternatively, "[o]ut-of-court statements may generally be admitted provisionally, subject to a motion to strike should the evidence presented through the course of the Commonwealth's case fail to establish the existence of a joint venture." Commonwealth v. Bright, 463 Mass. 421, 426 n.9 (2012).

provided appropriate instructions to the jury regarding how to consider the statements both prior to their admission in evidence and in his final charge.[6]  The judge did not abuse his discretion in determining that the Commonwealth had established, by a preponderance of the other evidence presented, that Cruz's statements were made during the pendency of a joint venture with the defendant and in furtherance of that joint venture.

"A joint venture is established by proof that two or more individuals 'knowingly participated in the commission of the crime charged . . . with the intent required for that offense.'" Winquist, 474 Mass. at 521, quoting Bright, 463 Mass. at 435. There was ample evidence, independent of Cruz's statements, that the defendant and Cruz were engaged in a joint venture that led to the victim's death.  D'Alessandro, Machado, and Lawrence all testified that the defendant was chasing the victim around the convenience store parking lot and shouting expletives at the victim when Cruz arrived, got out of the car, pointed at the victim, and immediately joined the chase.  The same witnesses also testified that the defendant and Cruz pursued the victim down the street and into a back yard several houses away from

---

[6] Cruz's statements also could have been admitted as nonhearsay for some purpose other than the truth of the matter asserted; however, the judge here did not instruct the jury to consider Cruz's statements for some nontruth purpose.  See Wardsworth, 482 Mass. at 463.

the convenience store.  D'Alessandro, Lawrence, and another witness testified that both the defendant and Cruz struck the victim multiple times in the back yard, and then fled shortly after the victim fell to the ground.  This testimony establishes, by a preponderance of the evidence, that the defendant and Cruz "were involved in a joint venture that resulted in the victim['s] death."  Rakes, 478 Mass. at 38.

In addition, each of Cruz's statements was made during, and in furtherance of, the joint venture.  At the time of Cruz's first statement, he was just beginning to join the defendant in pursuing the victim.  The primary ends of the joint venture -- that is, catching and attacking the victim -- had not yet been achieved.  In pointing at the victim and saying, "Is that him? . . . Get him," Cruz furthered the venture by seeking to confirm the target, as evidenced further by Cruz immediately joining the chase.

As for Cruz's second statement in the back yard, the defendant contends that it was inadmissible as a statement in furtherance of the joint venture because the attack had been completed by that time.  We disagree.  "In essence, the inquiry to determine whether a statement was made during the pendency of a criminal enterprise and in furtherance of it 'focuses not on whether the crime has been completed, but on whether a joint venture was continuing.'"  Winquist, 474 Mass. at 522-523,

quoting Commonwealth v. Stewart, 454 Mass. 527, 537 (2009).
Cruz's statements were made mere moments after the stabbing; he
sought to confirm whether the defendant had "gotten" the victim,
and when the defendant confirmed that he had,[7] the two fled the
scene together. See Bright, 463 Mass. at 436-437 ("Efforts on
the part of a joint venturer to . . . effect an escape warrant
the inference that the joint venture continued . . .");
Commonwealth v. Freeman, 430 Mass. 111, 117 (1999) ("the
statements were made when the cooperative effort was in
progress, after the coventurers retreated immediately following
the crime"). The defendant's and Cruz's interests remained
aligned when Cruz made the challenged statements. See Rakes,
478 Mass. at 41 (continued "commonality of interests" indicates
ongoing venture [citation omitted]). Cruz's statements were
admitted properly.

2. Text messages. After a voir dire of Lawrence, the
judge allowed the Commonwealth to present evidence of three
incriminating text messages that originated from Lawrence's
cellular telephone (cell phone) that purportedly were authored
by the defendant and sent to Garnham one day after the stabbing.[8]

_____

[7] The defendant's own statement was not hearsay; it was
admissible as a statement of a party opponent. See Bright, 463
Mass. at 435; Mass. G. Evid. § 801(d)(2)(A) (2020).

[8] The three text messages are as follows:

The defendant argues that the admission of these messages was error because they were not properly authenticated. We disagree.

Before a communication may be admitted in evidence, the judge must make a determination regarding its authenticity; that is, the judge must determine whether there exists sufficient evidence that, if believed, a reasonable jury could find by a preponderance of the evidence that the communication in question is what it is purported to be. Commonwealth v. Purdy, 459 Mass. 442, 447 (2011). See Mass. G. Evid. § 901(a). Authentication may be accomplished by way of direct or circumstantial evidence, "including its '[a]ppearance, contents, substance, internal patterns, or other distinctive characteristics.'" Purdy, supra at 448, quoting Mass. G. Evid. § 901(b)(1), (4).

Here, evidence of the contents of the messages, including identifying information and other corroborating evidence, together with evidence of the originating device, was sufficient to authenticate the communications as having been authored by

---

11:19 A.M.: "ayo itz ez da story is we saw dude we chased hym he got away n 1 hour later we got a call sayin he died iight i dont want every1 gettin in troble 4 my shyt"

11:26 A.M.: "iight lil 1 is goin first to c wut happenz wyth her n shyt"

11:32 A.M.: "wurt i just told yu we try chasin hym n he got way then lyke an hour later they called sayin he got stabbed."

the defendant.  The first text message begins, "ayo itz ez."

Based on Lawrence's testimony during the voir dire, and the

defendant's statement to police, "EZ" was the defendant's

nickname.  In addition, the second message refers to "lil 1,"

which Lawrence indicated was the defendant's nickname for her.

See Commonwealth v. Johnson, 470 Mass. 300, 317 (2014).

Although evidence of identifying information within a

communication is not sufficient by itself to authenticate the

communication, see Purdy, 459 Mass. at 450, there were other

confirmatory circumstances that pointed to the defendant as the

author, see Commonwealth v. Webster, 480 Mass. 161, 170 (2018).

For example, one of the text messages suggested to Garnham that

the "story" they could present was "we saw dude we chased hym he

got away n 1 hour later we got a call sayin he died."

Consistent with this message, the defendant told police that,

although he chased the victim around the parking lot, the victim

got away.  The text messages and the defendant's admissible

statements to police sufficiently mirror one another to serve as

a confirming circumstance that the defendant authored the

messages.  See Johnson, 470 Mass. at 317-318.

Finally, the text messages originated from Lawrence's cell

phone.  Lawrence and the defendant lived together, and Lawrence

testified that the defendant had access to her cell phone when

the text messages were sent.  See Johnson, 470 Mass. at 317

(electronic mail sent from account shared by married defendants authenticated due to use of typical signature and other confirming circumstances).

Taken together, the confirming circumstances surrounding the text messages presented by the Commonwealth provided sufficient evidence for a reasonable jury to find by a preponderance of the evidence that the text messages were authored by the defendant.  Thus, the judge did not err in finding that the messages were admissible.

3.  Statements to investigators.  At trial the Commonwealth presented a redacted version of the videotaped interrogation of the defendant.  The defendant contends that his statements were improperly admitted because his Miranda waiver was involuntary, as were the statements he made thereafter.[9]

a.  Miranda.  i.  Custody.  "The requirements of Miranda . . . are not triggered unless the interrogation is custodial, and a defendant's failure to receive or understand Miranda warnings, or police failure to honor Miranda rights, does not result in suppression of a voluntary statement made in a noncustodial setting."  Commonwealth v. Hilton, 443 Mass. 597,

_____

[9] During the interview the defendant claimed that, although he chased the victim around the convenience store parking lot for a short time, he decided to stop running when the victim left the convenience store parking lot and continued to run down the street.

608-609 (2005), S.C., 450 Mass. 173 (2007). See Commonwealth v. Libby, 472 Mass. 37, 40 (2015). "Custodial interrogation is 'questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.'" Commonwealth v. Kirwan, 448 Mass. 304, 309 (2007), quoting Commonwealth v. Jung, 420 Mass. 675, 688 (1995).

The parties disagree as to whether the defendant was in custody during the interview. The question turns "primarily on the objective circumstances of the interrogation, and not on the subjective views of either the interrogating officers or the person being questioned." Commonwealth v. Sneed, 440 Mass. 216, 220 (2003). Circumstances that may shed light on the custody analysis include, but are not limited to, (1) the place of the interrogation; (2) whether the officers have conveyed to the person being questioned a belief or opinion that he or she is a suspect; (3) the nature of the interrogation; and (4) whether the suspect was free to end the interview. See Commonwealth v. Medina, 485 Mass. 296, 300-301 (2020) (four-factor Groome test provides framework but does not limit court's obligation to consider all relevant circumstances); Commonwealth v. Groome, 435 Mass. 201, 211-212 (2001). Here, based on the totality of

the circumstances, we conclude that the defendant was in custody during the interrogation.[10]

The closed-door questioning took place in a seven foot by seven foot interview room at the police station. See Commonwealth v. Bookman, 386 Mass. 657, 660 (1982), citing Commonwealth v. Alicea, 376 Mass. 506, 513 (1978) ("We recognize that there is a particular coercive element inherent in an interview at a police station"). See also Commonwealth v. Baye, 462 Mass. 246, 254 (2012) (interrogation custodial where, among other factors, defendant interrogated for two hours in windowless room at police station); Commonwealth v. Magee, 423 Mass. 381, 385 (1996) (interrogation custodial where, among other factors, defendant interviewed in closed room at police station).

The officers explicitly told the defendant that he was not in custody, and that he was considered a witness rather than a

---

[10] The defendant also argues that he was transported involuntarily to the police station. We do not agree. The judge who heard the motion to suppress found that two police officers arrived at the defendant's home at approximately 10:30 A.M. and informed the defendant and his mother that they wanted to bring the defendant to the police station for questioning. Although the defendant's mother, whose primary language is Spanish, testified at the hearing on the motion to suppress that the officers informed her that the defendant was required to accompany them, the judge found that the officers gave the defendant an option, and that he voluntarily agreed to accompany them to the station. This finding is not clearly erroneous. See Commonwealth v. Woollam, 478 Mass. 493, 505 (2017), citing Commonwealth v. Tremblay, 460 Mass. 199, 205 (2011).

suspect; however, despite maintaining a conversational tone, the officers asked him pointed questions from the beginning about where he was and what he was doing on the night in question. That is, the focus of the questioning was the defendant's own actions, rather than his observations of what other people were doing.[11]  See Magee, 423 Mass. at 385 (interrogation custodial where, among other things, questioning centered on defendant's potential criminal involvement).  Contrast Commonwealth v. Amaral, 482 Mass. 496, 501-502 (2019) (defendant "heavily influenced" direction of interrogation); Commonwealth v. Woollam, 478 Mass. 493, 507 (2017), cert. denied, 138 S. Ct. 1579 (2018) ("the defendant controlled the parameters of the interview, indicating which questions he would answer and which he would not"); Commonwealth v. Shine, 398 Mass. 641, 648-649 (1986) (questioning noncustodial where only questions asked were "natural preliminary questions designed to determine the defendant's identity and what he knew about the crime").

Finally, where, as here, the defendant's age was known to the police, we consider the fact that the defendant was seventeen at the time of the interview.  See J.D.B. v. North Carolina, 564 U.S. 261, 277 (2011) ("so long as the child's age

---

[11] In fact, approximately twenty-four minutes into the interview, the defendant asked the officers why he was being questioned and if he was a suspect.

was known to the officer at the time of police questioning, or would have been objectively apparent to a reasonable officer, its inclusion in the custody analysis is consistent with the objective nature of that test"). We are mindful that "a reasonable child subjected to police questioning will sometimes feel pressured to submit when a reasonable adult would feel free to go." Id. at 272.

Although none of the above factors is alone determinative, taken together they support a finding that the defendant was in custody during the entirety of the interrogation. See Baye, 462 Mass. at 253-254 (presence of many custodial factors supported determination that suspect was in custody).

ii. Validity of waiver. As mentioned, prior to questioning, the officers told the defendant that he was neither a prisoner nor a suspect, but instead was a witness. They also minimized the importance of Miranda protections, telling him that everyone to whom they speak is advised of his or her rights. The defendant argues that, given his age at the time of the interrogation, the tactics that the officers used resulted in an invalid waiver of his Miranda rights. Although we do not condone the interrogation methods used, we agree with the judge who heard the motion to suppress (motion judge) that the defendant knowingly waived his Miranda rights.

The validity of a Miranda waiver depends on the totality of the circumstances, including "promises or other inducements, conduct of the defendant, the defendant's age, education, intelligence, and emotional stability, experience with and in the criminal justice system, physical and mental condition, the initiator of the discussion of a deal or leniency (whether the defendant or the police), and the details of the interrogation, including the recitation of Miranda warnings."  Commonwealth v. Jackson, 432 Mass. 82, 86 (2000), quoting Commonwealth v. Mandile, 397 Mass. 410, 413 (1986), S.C., 403 Mass. 93 (1988).

Here, the defendant appeared alert, calm, and composed.  He indicated that he was in high school and demonstrated no difficulty communicating with or understanding the officers.  As each of the Miranda rights was read to the defendant from a printed form, the defendant nodded and responded affirmatively to indicate that he understood.  The defendant then readily signed the form acknowledging that he had been informed of and understood his Miranda rights.

The motion judge noted his concern that investigators used tactics that "could comprise 'minimization' and 'trickery'." See Commonwealth v. DiGiambattista, 442 Mass. 423, 433 (2004). We share that concern, especially because the defendant was

seventeen years old at the time.[12]  However, given the totality of the circumstances, we agree with the motion judge that the investigators' comments did not change the fact that the defendant gave every indication that he understood his Miranda rights and voluntarily relinquished them.  See Commonwealth v. Tremblay, 460 Mass. 199, 208 (2011).

b.  Voluntariness of statement.  The defendant separately contests the voluntariness of his statement.  See Magee, 423 Mass. at 387 ("Due process requires a separate inquiry into the voluntariness of the statement . . .").  The test for voluntariness is "whether, in light of the totality of the circumstances surrounding the making of the statement, the will of the defendant was overborne to the extent that the statement was not the result of a free and voluntary act" (citation

---

[12] In 2010 when the interrogation took place, the defendant, as a seventeen year old, did not have the benefit of having an "interested adult" present to ensure a knowing and voluntary waiver of rights.  This court held in Commonwealth v. A Juvenile, 389 Mass. 128, 133-134 (1983), that juveniles undergoing interrogation by the police were entitled to the presence of an "interested adult" who would offset the inherent imbalance present during police and juvenile interactions. However, because juveniles were then defined as persons under the age of seventeen, see Commonwealth v. Carey, 407 Mass. 528, 537 (1990), this protection was held to apply only to those under the age of seventeen.  See, e.g., Commonwealth v. Ray, 467 Mass. 115, 132 (2014).  After the enactment of St. 2013, c. 84, which "amended an array of statutory provisions to treat seventeen year olds as juveniles," the court expanded the interested adult rule to apply to seventeen year old individuals on a prospective basis.  Commonwealth v. Smith, 471 Mass. 161, 162, 167-168 (2015).

omitted). Tremblay, 460 Mass. at 207. See Commonwealth v. Selby, 420 Mass. 656, 663 (1995), S.C., 426 Mass. 168 (1997). "Relevant factors include, but are not limited to, 'promises or other inducements, conduct of the defendant, the defendant's age, education, intelligence and emotional stability, experience with and in the criminal justice system, physical and mental condition, the initiator of the discussion of a deal or leniency (whether the defendant or the police), and the details of the interrogation, including the recitation of Miranda warnings.'" Magee, supra at 388, quoting Mandile, 397 Mass. at 413.

As discussed, the defendant appeared composed, of at least average intelligence, and emotionally stable. He answered questions responsively, and there were no signs of coercion. As for the investigatory tactics used, after informing the defendant of his Miranda rights, the officers continued to stress that he was merely a witness. They told the defendant that he was one of "a bunch of people" they were talking to about the events on the night in question, and that they wanted his "perspective on things." Twenty-four minutes into the interview, when the defendant questioned whether he was a suspect, the officers once again reassured him that they were speaking with many other people as well. The deception at issue here involved putting the defendant at ease rather than ratcheting up the pressure of the conversation. Although we do

not condone deception designed to give a defendant a false sense of security, particularly a defendant who is a minor, here, given the other factors present, the officers' deception cannot be said to have affected the voluntariness of his statement. See DiGiambattista, 442 Mass. at 432 (police use of trickery does not compel suppression). We therefore agree with the motion judge that the defendant's statements were voluntarily made.

c. Invocation of right to remain silent. Approximately fifty-five minutes into the interview, the defendant invoked his right to remain silent by saying, "I'm done talking." In response, the officers informed the defendant that the victim had died and asked him if he wanted to view surveillance footage. The interrogation finally ended when, after reviewing the surveillance footage and continuing to proclaim his innocence, the defendant told the officers, "I'm done. I'm done. You come back at me when I have my lawyer, because I'm done."

As the Commonwealth concedes, the officers failed scrupulously to honor the defendant's clear invocation of his right to silence. Commonwealth v. Neves, 474 Mass. 355, 364 (2016), quoting Commonwealth v. Smith, 473 Mass. 798, 807 (2016) ("A postwaiver invocation must be 'scrupulously honor[ed]' by the police" [citation omitted]). Thus, everything the defendant

said after invoking his Miranda rights should have been suppressed. See Smith, supra at 808-809. Nevertheless, we conclude that the improperly admitted portion of the defendant's statement did not constitute reversible error.

Because the defendant moved to suppress the statements to investigators, we examine whether admission of the defendant's statements was harmless beyond a reasonable doubt. Commonwealth v. Hoyt, 461 Mass. 143, 154 (2011). "When analyzing whether an error was harmless beyond a reasonable doubt, 'we ask whether, on the totality of the record before us, weighing the properly admitted and the improperly admitted evidence together, we are satisfied beyond a reasonable doubt that the tainted evidence did not have an effect on the jury and did not contribute to the jury's verdicts.'" Commonwealth v. Molina, 467 Mass. 65, 79 (2014), quoting Commonwealth v. Tyree, 455 Mass. 676, 701 (2010).

Here, the information the defendant provided after he announced that he was "done talking" was, for the most part, cumulative of the statement he had already made. After invoking his right to silence, the defendant continued to insist, as he did earlier, that although he chased the victim in the convenience store parking lot, he ended the pursuit soon afterwards, and he was never behind the house where the victim's body was recovered. The admission of the portion of the

defendant's statement made after his invocation of silence was, therefore, harmless beyond a reasonable doubt.  See Commonwealth v. Galicia, 447 Mass. 737, 747-748 (2006) (erroneously admitted evidence cumulative of properly admitted evidence and therefore harmless beyond reasonable doubt).

4.  Involuntary manslaughter instruction.  The judge denied the defendant's request for an instruction on involuntary manslaughter at the close of the evidence.  The defendant contends that the failure to instruct on this point was error because if the jury found that someone else stabbed the victim, they could have found that the defendant did not share the intent to kill.  See Rakes, 478 Mass. at 32.  Because the judge did not provide an involuntary manslaughter instruction, the jury did not have the option of finding the defendant guilty of a lesser homicide offense.  The judge did not err.

"Involuntary manslaughter is an unlawful homicide unintentionally caused by an act which constitutes such a disregard of probable harmful consequences to another as to amount to wanton or reckless conduct" (quotation and citation omitted).  Commonwealth v. Carrillo, 483 Mass. 269, 275 (2019).  "[W]anton or reckless conduct is conduct that creates a high degree of likelihood that substantial harm will result to another."  Id., quoting Model Jury Instructions on Homicide 88 (2018) (involuntary manslaughter).  See Commonwealth v.

Welansky, 316 Mass. 383, 399 (1944). "In determining whether an involuntary manslaughter instruction must be given, we ask whether any reasonable view of the evidence would have permitted the jury to find wanton and reckless conduct rather than actions from which a plain and strong likelihood of death would follow" (quotations and citation omitted). Commonwealth v. Braley, 449 Mass. 316, 331 (2007). We conclude that the circumstances here did not warrant such an instruction, even viewing them in the light most favorable to the defendant. See Commonwealth v. Moseley, 483 Mass. 295, 303 (2019).

Based on the evidence presented to the jury, the defendant, with a knife in his hand, chased the victim around the parking lot of a convenience store. Minutes later, the defendant was spotted with another man pursuing the victim up the street. Two witnesses testified that they heard slapping noises and groaning coming from the area where the two men had chased the victim. Those two witnesses also saw arms flailing while two men attacked the victim. D'Alessandro testified that he heard the two attackers speak to one another just after the attack: one asked, "Did you get him? Did you get him?", and the second responded, "Yes I got him." The victim was stabbed repeatedly with a knife in the chest cavity, with stab wounds entering the victim's lungs.

Because it is obvious that stabbing the victim created a plain and strong likelihood that death would follow, an involuntary manslaughter instruction was not warranted. See Commonwealth v. Pagan, 471 Mass. 537, 547, cert. denied, 136 S. Ct. 548 (2015) (involuntary manslaughter instruction not warranted where defendant stabbed victim in abdomen with eight-inch blade); Commonwealth v. Pierce, 419 Mass. 28, 33 (1994) (involuntary manslaughter instruction not warranted where victim received multiple stab and slash wounds, each sufficient to cause death).

Further, although we acknowledge that two or more joint venturers can participate in a criminal act with different mental states with respect to that act, see Commonwealth v. Tavares, 471 Mass. 430, 441 (2015), there was no basis for such a finding here. Even if the jury had found that the defendant was not the individual who stabbed the victim, evidence of the circumstances surrounding the beating established that the defendant knew that there was a plain and strong likelihood that death would result from the joint actions of the attackers. See Commonwealth v. Tague, 434 Mass. 510, 518-519 (2001), cert. denied, 534 U.S. 1146 (2002) (involuntary manslaughter instruction not warranted where multiple people beat victim to death with variety of weapons, including knives). We discern no

error in the trial judge's denial of the defendant's request for an instruction on involuntary manslaughter.

5. Postconviction motions. After his conviction, the defendant moved for a new trial, arguing that his trial counsel was ineffective for failing to uncover additional third-party culprit evidence, and that he was unfairly deprived of exculpatory evidence. The defendant sought posttrial discovery as well as an evidentiary hearing in connection with the motion for a new trial. He now appeals from the denial of his postconviction motions.

a. Failure to investigate. In December 2013, Garnham was shot and killed in Pittsburgh, Pennsylvania, by a State police trooper during a standoff with police after having kidnapped and threatening to kill his former girlfriend's baby. The defendant faulted his trial counsel for failing to investigate the death, claiming that, as a result, the attorney failed to discover the additional evidence that Garnham had admitted to his former girlfriend that he stabbed the victim.

A defense attorney is considered to have provided ineffective assistance in defending a charge of murder in the first degree if an error made "was likely to have influenced the jury's conclusion." Commonwealth v. Wright, 411 Mass. 678, 682 (1992), S.C., 469 Mass. 447 (2014) (substantial likelihood of miscarriage of justice standard). See G. L. c. 278, § 33E. An

attorney's strategic or tactical decision constitutes error "only if it was manifestly unreasonable when made" (citation omitted). Commonwealth v. Coonan, 428 Mass. 823, 827 (1999).

The decision not to investigate Garnham's death was not manifestly unreasonable. There was no reason for trial counsel to believe that undertaking such an investigation would have yielded any information that would have been helpful to the defendant. Although, at the time of his death, Garnham was expected to return to Massachusetts to testify in Jean's trial for murder, he already had testified in Cruz's trial earlier that year. And nothing about the particular circumstances in which Garnham died suggested a connection between his death and the killing of the victim. See Commonwealth v. Watt, 484 Mass. 742, 764 (2020) (no error in failing to investigate speculative theories). As trial counsel did not err in this aspect of the case, there was no ineffective assistance.

Even if we determined that trial counsel did err in failing to request the police reports prepared in connection with Garnham's death, such reports likely would not have influenced the jury's conclusion. First, assuming Garnham was truthful when he confessed to being the person who stabbed the victim, that fact would not have exculpated the defendant.[13] As

---

[13] One eyewitness testified that he saw two attackers in the back yard, and a second eyewitness testified that there were

discussed, to prove the defendant guilty as a joint venturer, the Commonwealth needed only to demonstrate that the defendant was engaged with others in the attack with the requisite intent. See Rakes, 478 Mass. at 32. Second, the statement from Garnham's former girlfriend would have been cumulative to evidence that the defense had presented at trial demonstrating that Garnham was involved in the attack and, more specifically, that he told others of his involvement.[14] The failure to discover and present such evidence is not ineffective assistance.[15] See Commonwealth v. Freeman, 442 Mass. 779, 791 (2004), S.C., 451 Mass. 1006 (2008).

---

three attackers. However, both testified that only one of the attackers wore white; everyone else, including the victim, wore dark clothing. Thus, an assumption that Garnham, who wore a dark tank top, was one of the attackers does not suggest an inference that the defendant, who wore white, was not.

[14] Defense counsel explored Garnham's involvement in the killing through cross-examination of the Commonwealth's witnesses. The evidence elicited included testimony from Lawrence suggesting that Garnham allegedly disposed of a knife after the stabbing, and testimony from an investigator that in the days afterward Garnham cut his hair and then left the State. Trial counsel also called two witnesses who testified that Garnham made several statements implicating himself in the attack.

[15] The defendant moved for postconviction discovery regarding any favorable treatment that the Commonwealth provided to Garnham, as well as any statements of Amber Nice, Garnham's girlfriend at the time of the victim's stabbing, who told police that Garnham admitted to being involved in the attack. "Posttrial discovery may be authorized where affidavits filed by the moving party 'establish a prima facie case for relief.' Mass. R. Crim. P. 30 (c) (4)[, as appearing in 435 Mass. 1501

b.  Deprivation of Torrey's testimony.  Based on the evidence presented to the jury, including surveillance footage and Lawrence's testimony, Torrey attempted to hold the defendant's arm to prevent him from chasing the victim, but ultimately was unsuccessful.  Soon thereafter, Torrey drove to the house behind which the victim had been attacked and called for the defendant, Garnham, and Lawrence to get in her car.  She then drove away from the scene.  Torrey was indicted as an accessory after the fact in connection with the victim's killing.

During Jean's trial, which took place approximately eight months prior to the defendant's trial, the Commonwealth sought a court order granting Torrey immunity from prosecution, but later

---

(2001)]."  Commonwealth v. Sealy, 467 Mass. 617, 628-629 (2014), citing Commonwealth v. Daniels, 445 Mass. 392, 407 (2005).  "To meet the prima facie case standard for discovery under a motion for a new trial based on newly discovered evidence, a defendant must make specific, not speculative or conclusory, allegations that the newly discovered evidence would have 'materially aided the defense against the pending charges,' Commonwealth v. Tucceri, 412 Mass. 401, 405 (1992), and that this evidence, if explored further through discovery, could yield evidence that might have 'played an important role in the jury's deliberations and conclusions, even though it is not certain that the evidence would have produced a verdict of not guilty.'  Id. at 414."  Daniels, supra.  That is, "the defendant must make a sufficient showing that the discovery is reasonably likely to uncover evidence that might warrant granting a new trial."  Sealy, supra at 629, quoting Daniels, supra.  Here, because the defendant's conviction as a joint venturer does not depend on whether and to what extent Garnham was involved in the attack, it was not error to deny the defendant's motion for posttrial discovery on that issue.

withdrew its request.  Jean's counsel moved the trial judge to grant Torrey judicial immunity so that he could call her as a witness, but that motion was denied.  Torrey later invoked her right under the Fifth Amendment to the United States Constitution to remain silent in connection with the defendant's trial,[16] and defense counsel did not seek judicial immunity for her.

The defendant posits that because the Commonwealth withdrew its application to grant Torrey immunity, her testimony would have been unfavorable to the Commonwealth and, conversely, favorable to the defendant.  Thus, he asserts that the Commonwealth improperly prevented Torrey from providing testimony that may have exculpated him, and that the judge who decided the postconviction motions (postconviction judge) erred in failing to order an in camera hearing to learn the substance of Torrey's potential testimony.  However, other than pointing to the Commonwealth's decision not to seek immunity from prosecution for Torrey, the defendant has not provided any support for this claim.  That is, he has failed to explain how

---

[16] Although the Commonwealth had dismissed the indictment against Torrey by the time of the defendant's trial, she presumably could have been reindicted.

Torrey's testimony might have exculpated him.  There was no error.[17]

6.  Review under G. L. c. 278, § 33E.  Aside from the arguments raised on appeal, the defendant points to three other issues that, he argues, together warrant relief pursuant to G. L. c. 278, § 33E.  We do not agree.

First, he contends that trial counsel erroneously declined a humane practice instruction with regard to the statements he made to police.  In order to be entitled to a humane practice instruction, the voluntariness of the defendant's statements to police must be a live issue at trial.  Commonwealth v. Gallett, 481 Mass. 662, 686-687 (2019).  Although the defendant raised the voluntariness of his statements in a motion to suppress pretrial, that motion was denied; the issue was not revisited at trial.  Consequently, the trial judge was not required to give a humane practice instruction.  See Amaral, 482 Mass. at 506-507.

---

[17] The postconviction judge did not err in denying the defendant's motion without a hearing.  A judge need not hold a hearing in connection with deciding a motion for a new trial if "no substantial issue is raised by the motion or affidavits." See Mass. R. Crim. P. 30 (c) (3), as appearing in 435 Mass. 1501 (2001).  The postconviction judge determined that the documents filed with the defendant's motion provided all of the information necessary for him to decide the motion, and that thus a hearing was unnecessary.  He did not abuse his discretion in this matter.  See Commonwealth v. Goodreau, 442 Mass. 341, 348-349 (2004).

Second, the defendant points to the fact that Garnham's brother, who testified as to inculpatory statements made by Garnham, appeared in handcuffs without a jury instruction to mitigate potential prejudice. However, prior to his testimony, trial counsel agreed to a procedure where the witness would be in place prior to the arrival of the jury, and keep his hands from view. As the defendant presents no evidence to suggest that the jury were aware that the witness was in handcuffs, there was no error in failing to provide an instruction on the matter.

Finally, the defendant points to his "youth" and "impetuosity," combined with "spontaneous rapidly unfolding events," as factors to be considered under § 33E. As the defendant was a juvenile at the time of the killing, his penalty for murder in the first degree was a sentence of life in prison with, rather than without, the possibility of parole. See Diatchenko v. District Attorney for the Suffolk Dist., 466 Mass. 655, 673 (2013), S.C., 471 Mass. 12 (2015). Therefore, the defendant's youth, and everything that comes with it, including impetuosity, in fact was taken into consideration. See id. at 669-670. As for the spontaneous nature of the rapidly unfolding events, we do not agree that this factor deserves any additional consideration under § 33E, given that the defendant is the one who set those events in motion.

Upon review of the above issues, and the entire record, we discern no error that resulted in a substantial likelihood of a miscarriage of justice.  For that reason we decline to order a new trial or reduce the degree of guilt under G. L. c. 278, § 33E.

Conclusion.  For the foregoing reasons, the defendant's conviction is affirmed.  The orders denying the motions for postconviction discovery and for a new trial are also affirmed.

So ordered.